## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————
                                              )
BRIDGETTE FEEMSTER, et al.,                   )
                                              )
        Plaintiffs,                           )        Civil Action No. 04-1901 (RBW)
                                              )
v.                                            )
                                              )
BSA LIMITED PARTNERSHIP,                      )
                                              )
        Defendant.                            )
———————————————————————                       )

## MEMORANDUM OPINION

        This is an action seeking a declaratory judgment, injunctive relief, and damages under the

Multifamily Assisted Housing Reform and Affordability Act of 1997, as amended, 42 U.S.C. §

1437f (1997) ("MAHRAA"); the National Housing Act ("NHA"), 12 U.S.C. § 1701, et. seq.

(2004); the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1402.21 (2001);

the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901 et. seq.

(2001); and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 (2000).  Second Amended

Complaint ("Compl.").  at 2, 4-5.  The dispute between the parties centers around BSA Limited

Partnership's ("BSA") September, 2004 decision to opt-out of the project-based Section 8

Housing Assistance program and its refusal to accept enhanced vouchers as payment for rent

from the plaintiffs since that time.  Id. at 2.  Currently before the Court are the Defendant's

Motion for Summary Judgment and the Plaintiffs' Motion for Partial Summary Judgment and

Opposition to Defendant's Motion for Summary Judgment.[1]  For the reasons set forth below,

_____

[1] In response to this Court's requirement that the parties provide it a status report, the parties submitted the following information which narrows some of the issues pending before this court:  Counts I, II and V of the complaint are now moot with respect to plaintiffs Bridgette Feemster, Beatrice Harris, Dyanne Johnson, Shirley

(continued...)

both motions are granted in part and denied in part.

## I. Factual Background[2]

The Bates Street Townhomes are a number of single-family and multi-family townhouses located in Northwest Washington, D.C.  Compl. at 12.  The tenants in this case have been living in some of the townhomes for up to 25 years.  Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Partial Summary Judgment and Opposition to Defendant's Motion for Summary Judgment ("Pls.' Mem.") at 10.  Sometime during the 1980s, the owner of the townhomes and the United States Department of Housing and Urban Development ("HUD") executed a Housing Assistance Payment Contract ("HAP contract") for the provision of project-based Section 8 assistance to residents of the Bates Street Townhomes.  Id.  After renting the townhomes with the assistance of the project-based subsidies for over two decades, BSA's project-based contract with HUD expired.  Pls.' Mem. at 10.  Consequently, BSA provided the plaintiffs and the other Section 8 residents at the Bates Street Townhomes with letters giving them a one-year notice of its decision to opt-out of the Section 8 HAP contract, effective September 30, 2004, id. at 11 (citing Exhibit ("Ex.") B (Opt-out letter dated September 30,

---

[1](...continued)
Holland, and Mary Brown because these plaintiffs have purchased their homes as the Bates Street Townhomes Cooperative.  However, Counts III and IV remain alive with respect to these plaintiffs.  As to plaintiffs Michelle Hawkins, Lillian Johnson, Sabrina Lymore, Dorothy Paul, and Shirley Lattimore, all of their claims remain alive.  See Joint Status Report Regarding Pending Motions in Response to the Court's June 28th Order ("Joint Status Report").

[2]The background facts and arguments therein, as presented by the plaintiffs, have not been disputed by the defendant.  "It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."  Hopkins v. Women's Div., General Bd. of Global Ministries, 238 F. Supp. 2d 174, 178 (D.D.C.2002) (citations omitted).  Accordingly, the Court will treat the plaintiffs' arguments that are not addressed by the defendant as conceded, and where record evidence is not cited, the Court has construed the facts offered as support for the arguments advanced by the plaintiffs as also having been conceded by the defendant.

2003).  The letter informed the tenants that they were eligible for tenant-based Section 8

vouchers.  Specifically, the letter stated:

> Federal law allows you to elect to continue living at this property provided that the
> unit, the rent, and we, the owners, meet the requirements of the Section 8 tenant-
> based assistance program.  As an Owner, we will honor your right to remain at the
> property on this basis as long as it continues to be offered as rental housing,
> provided that there is no cause for eviction under Federal, State or local law.

Id., Ex. B.

According to the plaintiffs, beginning in the summer of 2004, BSA started to pressure the

Bates Street tenants to move out of their homes and employed two individuals to assist in the

effort.  Pl.'s Mem. at 11.  The tenants felt they were being pressured to vacate their homes

because the two employees who repeatedly visited them to assist with the process of applying for

tenant-based vouchers also offered them money as an incentive to vacate their homes within 30

days of receiving their vouchers.  Id.  In addition, the plaintiffs were informed that they could not

use their vouchers to remain at their Bates Street homes, and that they had no option other than to

relocate.  Id.  In anticipation of the defendant's opt-out decision, the District of Columbia

Housing Authority ("DCHA") convened a meeting with the tenants of the Bates Street

Townhomes to address the process of converting their project-based subsidies to the tenant-based

program.  Id. at 11-12.  The plaintiffs, along with other residents, were provided information

about the opt-out process and their opportunity to receive, through the DCHA, tenant-based

vouchers which they could use to remain at Bates Street Townhomes or to acquire rental property

at other locations.  Id.

Following the meeting with the DCHA, plaintiff Feemster contacted BSA to inquire

about using her voucher to remain in her townhouse and was informed that BSA would not

accept her voucher.  Id.  BSA's counsel initially denied that it refused to accept Feemster's

voucher, but in late September 2004, the plaintiffs received letters from BSA refusing to accept

their enhanced vouchers as payment for the rental of their homes.  Id.  The letters reiterated that

the Section 8 HAP contract was being terminated and informed the plaintiffs that BSA would not

sign or execute "any lease agreements or lease addenda . . . ." Id. at 12-13 (citing Ex. C (letters

sent to the plaintiffs)).  BSA stated, however, that it would accept the rent for the units if the

plaintiffs personally paid it.  Id.

    BSA's refusal to execute lease agreements or lease addenda left the plaintiffs unable to

use their vouchers to pay rent for their Bates Street residences.  Id. at 13.  Consequently, in

November, 2004, the plaintiffs filed their initial complaint in this action, along with an

application for a Temporary Restraining Order ("TRO").  Id. at 13.  The Court granted the TRO

and required the defendant "to initiate the process of accepting [the p]laintiffs' enhanced

vouchers, to wit: immediately sign, complete, and submit any necessary papers to the [DCHA] to

begin the 'lease-up'[3] process so that [the p]laintiffs will be able to use their enhanced vouchers

at their current homes . . . ."  Id.; see also TRO dated November 5, 2004.[4]  The defendant

complied with the TRO and submitted "lease-up packages" to the DCHA, but has refused to

complete the voucher process or pay the plaintiff the utility allowances as had been the case

under the project-based contract.  Pls.' Mem. at 13.  After issuance of the TRO, BSA issued the

plaintiffs offers to purchase their homes in November, 2004.  Id. at 14.  Four of the ten plaintiffs

---

[3]The "lease-up" process required the defendant "to initiate the process of accepting the plaintiffs' enhanced vouchers, to wit: immediately sign, complete, and submit any necessary papers to the District of Columbia Housing Authority to" enable the plaintiffs to use their enhanced vouchers at their current residences.  See TRO at 2.

[4]The hearing on the motion for the TRO was conducted and the TRO was issued by Judge Henry H. Kennedy, Jr.

responded by submitting letters of interest, and they have since purchased their units.  Id.; see also Joint Status Report at 1.

On or about January 6, 2005, BSA served the plaintiffs who had not responded to the purchase offers with 180-day Notices to Vacate for Discontinuance of Housing Use.  Pls.' Mem. at 14 (citing Ex. 3 to Defendant's Motion for Summary Judgment ("Def.'s Mem.")).  The notices indicated that the units were going to "be renovated and sold for home-ownership."  Id.  On January 11, 2005, BSA entered into a contract with TMS Investments, LLC ("TMS") for TMS to purchase several vacant units at the Bates Street Townhomes.  Id. (citing Ex. 1 to Def.'s Mem. (Sales Contract between BSA and TMS)).  The contract provided that TMS would purchase additional units as they became vacant, and the initial closing date was scheduled for April 1, 2005; however, that date was extended to July 12, 2005.  Id. (citing Ex. J (amendment to sales contract for purchase of vacant Bates Street Townhomes)).  The contract explicitly conditioned the purchase of any individual units on such units being free of tenants at the time of the closing date.  Id. (citing Ex. 1 to Def.'s Mem.).

The plaintiffs filed their initial complaint in this action on November 4, 2004, and filed their second amended complaint on March 17, 2005.  Both parties have now moved for summary judgment.  BSA requests summary judgment on all counts of the second amended complaint and the plaintiffs request partial summary judgment with respect to Counts I, II, and III of their second amended complaint based on alleged violations of the MAHRAA, the NHA and the DCHRA.  The plaintiffs also seek to enjoin the defendant from interfering with their right to remain in their residences by refusing to accept their enhanced vouchers.  See Compl. at 2.  Specifically, the plaintiffs' argue that BSA's refusal to accept payment in full for their homes if

their rental payments are in the form of enhanced vouchers violates both federal and District of
Columbia law.  Pls.' Mem. at 2.  On the other hand, the defendant justifies its refusal to accept
the enhanced vouchers, stating that it has lawfully opted out of the Section 8 project based
program, has a contract to sell the units to a third party, and has complied with all local laws
necessary to remove the units from the rental housing market in anticipation of selling the
property.  Def.'s Mem. at 1.

## II.  Standard of Review

Courts will grant a motion for summary judgment under Rule 56(c) "if the pleadings,
depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,
show that there is no genuine issue as to any material fact and that the moving party is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When ruling on a summary judgment
motion, courts must view the evidence in the light most favorable to the non-moving party.  Bayer
v. Dep't of Treasury, 956 F.2d 330, 333 (D.C. Cir. 1992); see also Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 255 (1986) (holding that courts must draw "all justifiable inferences" in the
nonmoving party's favor and accept the nonmoving party's evidence as true).  "[T]he nonmoving
party 'must do more than simply show that there is some metaphysical doubt as to the material
facts,'"  Bias v. Advantage Int'l., Inc., 905 F.2d 1558, 1561 (D.C. Cir. 1990) (quoting Matsushita
Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986)), but rather must "provide evidence
that would permit a reasonable [fact-finder] to find" in the non-moving party's favor.  Laningham
v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  Under Rule 56, "if a party fails to establish
the existence of an element essential to that party's case and on which that party will bear the
burden of proof at trial," summary judgment is warranted.  Hazward v. Runyon, 14 F. Supp. 2d

120, 122 (D.D.C. 1998) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  Finally, in

considering a motion for summary judgment, "the court . . . may not make credibility

determinations or weigh the evidence."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S.

133, 150 (2000).

### III.  Discussion

**A.  The Multifamily Assisted Housing Reform and Affordability Act of 1997 (as amended) (42 U.S.C. § 1437f); and the National Housing Act, 12 U.S.C. § 1701, et seq.  (Counts I and II)**

**1.  Statutory Background**

In 1974, Congress enacted the Section 8 New Construction and Substantial Rehabilitation

Program, which was established for the purpose of "aiding low-income families in obtaining a

decent place to live and of promoting economically mixed housing . . . ."  Pls.' Mem. at 3

(quoting 42 U.S.C. § 1437(a)).  This "project-based Section 8" program authorized by Congress

and administered by HUD,  provides rental assistance payments to owners of residential rental

properties on behalf of low-income tenants.  Id. (citing 42 U.S.C. § 1437f(a)).  Property owners

may "opt out" of the project based Section 8 program at the end of a specified period of time.  Id.,

Ex. M (HUD Policy Guide) Ch. 8 at 1.  In 1997, Congress enacted the MAHRAA.  The

underlying purpose of the MAHRAA is to protect tenants impacted by the termination of expiring

project-based Section 8 contracts and to prevent their displacement.  Id. at 3-4; 42 U.S.C. §

1437f(a).  Specifically, the MAHRAA provides that "the Secretary shall make enhanced voucher

assistance under section 8(t) of the United States Housing Act of 1937 (42 U.S.C. §1437f(t))

available on behalf of each low income family who, upon the date of such expiration [of the

project-based Section 8 program], is residing in an assisted dwelling unit in the covered project."

Pls.' Mem. at 4 (quoting Pub. L. No. 106-74, § 531, 113 Stat. 1047, 1113 (1999) (emphasis

added).[5]  Enhanced vouchers are part of the federal housing subsidy scheme and are administered

locally by the DCHA.  Id. (citing 42 U.S.C. § 1437f(o)).  This program is distinguishable from the

project-based program because it is a tenant-based subsidy that attaches to an individual rather

than to a particular apartment or other types of residential rental property.  See 42 U.S.C. §

1437f(f)(6)-(7).  The enhanced voucher program requires the tenant to pay approximately 30

percent of his or her income as rent, and the local housing authority pays the remainder of the rent

---

[5]42 U.S.C. § 1437f(t)(1) provides:

(t) Enhanced vouchers

(1) In general

Enhanced voucher assistance under this subsection for a family shall be voucher assistance under subsection (o) of this section, except that under such enhanced voucher assistance--

**(A)** subject only to subparagraph (D), the assisted family shall pay as rent no less than the amount the family was paying on the date of the eligibility event for the project in which the family was residing on such date;

**(B)** the assisted family may elect to remain in the same project in which the family was residing on the date of the eligibility event for the project, and if, during any period the family makes such an election and continues to so reside, the rent for the dwelling unit of the family in such project exceeds the applicable payment standard established pursuant to subsection (o) of this section for the unit, the amount of rental assistance provided on behalf of the family shall be determined using a payment standard that is equal to the rent for the dwelling unit (as such rent may be increased from time-to-time), subject to paragraph (10)(A) of subsection (o) of this section and any other reasonable limit prescribed by the Secretary, except that a limit shall not be considered reasonable for purposes of this subparagraph if it adversely affects such assisted families;

**(C)** subparagraph (B) of this paragraph shall not apply and the payment standard for the dwelling unit occupied by the family shall be determined in accordance with subsection (o) of this section if--

 **(i)** the assisted family moves, at any time, from such project; or

 **(ii)** the voucher is made available for use by any family other than the original family on behalf of whom the voucher was provided; and

**(D)** if the income of the assisted family declines to a significant extent, the percentage of income paid by the family for rent shall not exceed the greater of 30 percent or the percentage of income paid at the time of the eligibility event for the project.

(emphasis added).

directly to the landlord each month.  Pls.' Mem. at 4 (citing 42 U.S.C. § 1437f(o)(2)).  In

conjunction with the tenant's right to remain in his or her housing unit, is a landlord's obligation

to complete the requirements necessary to participate in the voucher program.  To that end, both

federal and local law require landlords to complete the paperwork necessary to participate in the

voucher program.  See generally 42 U.S.C. § 1437f(o)(7); 24 C.F.R. § 982.305(b)(ii) (stating that

before the lease term commences "[t]he landlord and the tenant [must] have executed the lease

(including the HUD-prescribed tenancy addendum[.]")); Pls.' Mem., Ex. M (Housing Choice

Voucher Program Guidebook #7420.10G) at Chap. 11 at 11-14 (stating that "[t]he PHA shall

require the owner to use a lease provided by the PHA" and "[t]he owner must sign the HUD

tenancy addendum with the [] tenant.").

Because the underlying purpose for enacting the MAHRAA – to give families the right to

remain in their units after the expiration of a project-based contract – was not sufficiently clear, in

2000, Congress acted to clarify that under the MAHRAA families residing in project-based

Section 8 units at the time an opt-out decision is exercised, have the right to continue living in

their current homes.  Pls' Mem. at 4-5 (citation omitted); see also 42 U.S.C. §1437f(t)(1)(B).  In

this regard, the National Housing Act, 12 U.S.C. § 1701, et. seq., compliments the MAHRAA by

providing that "the Secretary shall assure that . . . project owners not interfere with the efforts of

tenants to obtain rent subsidies or other public assistance;"  12 U.S.C. § 1715z-1b(b)(2).

In conjunction with the amendment to the MAHRAA, HUD issued two publications that

provide guidance to tenants regarding their right to remain in their homes when landlords decide

to exercise their opt-out prerogative.  Pls.' Mem. at 5.  The first publication, entitled Section 8

Renewal Policy Guide ("HUD Policy Guide") and issued on January 19, 2001, specifically

provided that "[t]enants who receive an enhanced voucher have the right to remain in their units as long as the units are offered for rental housing when issued an enhanced voucher sufficient to pay the rent charged for the unit, provided that the rent is reasonable." Id. (citing Ex. M (HUD Policy Guide) Ch. 11 at 3). The HUD Policy Guide also requires owners who have decided to opt-out of the project-based Section 8 program to certify that they "will comply with the requirement to allow families receiving enhanced vouchers who elect to remain do so as long as the property remains a rental property, unless the owner has just cause for eviction." Id. at 5-6 (citing Ex. M., Ch. 1 at 9 & Attachment ("Attach.") 3A-1 at 6A.2. (requiring owners to "certify that they agree to honor the tenants' right to remain at the property, provided that the [local Public Housing Agency] approves a rent equal to the new rent, and the rent is reasonable")). The second publication, issued on November 14, 2001, addressed the right of Section 8 tenants to remain in their residences stating that "[a] family that receives an enhanced voucher has the right to remain in the project as long as the units are used for rental housing and are otherwise eligible for housing choice voucher assistance . . . ." Id. at 6 (citing Ex. M (U.S. Department of Housing and Urban Development Office of Public and Indian Housing, Notice PIH 2001-41 (HA)) at 15). Both HUD publications provide that "[i]f an owner refuses to honor the tenants right to remain, the tenant's remedy will depend on State and local law." See Pls.' Mem., Ex. M, (HUD Policy Guide) Ch. 11 at 3; U.S. Department of Housing and Urban Development Office of Public and Indian Housing, Notice PIH 2001-41 (HA)) at 15.

    In the District of Columbia, the rights and obligations of landlords and tenants are governed

principally by two statutory enactments.[6]  The Rental Housing Act, D.C. Code § 42-3501.01 et

seq. (2001), governs the termination of tenancies and evictions, while the Rental Housing

Conversion and Sale Act, D.C. Code § 42-3401.01 et. seq. (2001), governs landlords ability to sell

or convert rental property and the rights of tenants' in such circumstances.  Pls.' Mem. at 6;

Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment ("Def.'s

Mem.") at 4; Defendant's Opposition to Plaintiffs' Motion for Summary Judgment ("Def.'s

Opp'n") at 2-3.

## 2. The Parties' Arguments

In support of its summary judgment motion, defendant BSA argues that it has lawfully opted

out of its Section 8 HAP contract with HUD, having followed all requirements for doing so, with

the express purpose of selling all vacant units that comprise the Bates Street Townhouses to a

third party developer.  Def.'s Mem. at 2-3.  The defendant contends that it has provided the

plaintiffs with the 180-day notice of its intent to sell the property as required by District of

Columbia law .  Id. at 4 n. 13 (citing Affidavit of Dennis Makielski ¶ 8; Ex. 3 to Def.'s Mem.

(Notices to Vacate)).  BSA notes that the HUD Policy Guide explicitly states that a tenant's "right

to remain" in residential rental property is dependent upon the unit being "offered for rental

housing."  Id. at 5-6; see also  Def.'s Mem., Ex. 4 (HUD Policy Guide Sections 11-3(B)(1) and

(2)).  The defendant interprets the phrase, "continued to be offered for rental housing" in

situations like this involving occupied rental units, by considering prospectively what the owner

intends to do with the property and reasons that looking to the present use would result in an

---

[6]Both parties agree that a landlord in the District of Columbia must adhere to District of Columbia law in order to terminate a tenant's occupancy of residential rental property.  Pls.' Mem. at 6; Def.'s Opp'n at 3.

"endless lease" for tenants using enhanced vouchers who choose to remain in their units because there will always be a tenant presently in the unit, regardless of whether the owner plans to continue renting the property.  Id. at 9.  Relying on this interpretation, the defendant represents that the rental units in question no longer continue to be offered as rental housing, which therefore relieves it of any obligation to accept individual vouchers for the rental of the property.  Id. at 5.  The defendant further contends that "[u]nless [the] plaintiffs can offer admissible evidence to contradict BSA's facts that it is not offering the plaintiffs' units, or indeed, any of the other units for rent, BSA is entitled to judgment on all of the [p]laintiffs' federal claims."  Id.  Moreover, the defendant posits that either the DCHA or HUD is insisting that the plaintiffs secure lease agreements for a minimum of one year as a condition for issuing the vouchers.  Id. at 6.  BSA therefore asserts that the real dispute is between the plaintiffs and one of the two government agencies because it is willing to accept vouchers from the plaintiff for the period of time it insists (less than one year) the plaintiffs are entitled to remain in their rental units under District of Columbia law.  Id. at 6-7.  BSA notes that because the one year term was greater than the time remaining before the scheduled sale of the property, it declined to award a lease for that term, but that it was willing to accept vouchers for a shorter period of time prior to the scheduled sale of the property.  Id. at 6.  As additional support of its position that the Bates Street Townhomes are not being offered as rental property, the defendant contends that it has not solicited or accepted any leases for the units, and has complied with local law necessary to render all of the units vacant in anticipation of the sale.  Id.

The plaintiffs, on the other hand, oppose the defendant's motion for several reasons.  First the plaintiffs contend that the defendant must accept their vouchers because their homes currently

remain rental housing.  Pls.' Mem. at 16.  They opine, in direct contradiction of the defendant's

position, that the term "offered for rental housing" raises, as a matter of law, not a question of the

landlord's intent, future plans, or lack of efforts to attract new tenants," but rather a question

concerning "the current status of the property, not its future use."  Id. at 16-17.  The plaintiff

contends that "property that is being used [for residential] . . . rental [purposes] continues in that

status until the landlord has successfully and lawfully converted it – which BSA has not done."

Id. at 17.  Second, the plaintiff argues that the defendant has not lawfully exercised its right to

terminate the rental use of the plaintiffs' homes.  Id. at 22.  The plaintiffs concede that BSA "has

every right to withdraw the plaintiffs' homes from the rental market, [but] has not yet done so –

nor is its stated plan, renovation and sale for home ownership a valid basis for such withdrawal."

Id. (internal quotations omitted).  They conclude that "[w]ithout a lawful basis for conversion, and

without completing the conversion process – including evicting the [plaintiffs] through D.C.'s

landlord-tenant court – BSA cannot establish that the homes are no longer 'offered for rental

housing.'"  Id. at 22-23.  Thus, the plaintiffs contend that "[n]either intent to sell nor sale of a

tenant's home is sufficient to terminate the property's status as rental housing.  Id. at 24 (citing

D.C. Code § 42-3505.01 (2001) (providing an exhaustive list of circumstances when a housing

provider may recover possession of a rental unit, which does not include the owner's intent to sell

the property)).  Third, the plaintiffs argue that the administrative requirements of the enhanced

voucher program do not relieve the defendant of its obligation to comply with the law.  Id. a 27.

Specifically, BSA has stated that it would "gladly accept the voucher" provided that it need not

sign "a new lease or lease amendment at least a year long."  Id. (citing Def.'s Mem. at 6).

However, the plaintiffs note that "nothing in the enhanced voucher statute or HUD guidance

authorizes a landlord to refuse enhanced vouchers merely because it dislikes the requirements of

the program.  Id.  And under the voucher program, the landlord is required to complete a HAP

contract and Lease Addendum.  Id. at 29 (citing Ex. M, Administrative Plan for the Housing

Choice Voucher Program, Voucher Program at 80).  Moreover, the DCHA, the local agency

responsible for administering the voucher program, also requires the parties to execute a new lease

or provide an addendum to an existing lease with the commencement date of the lease

corresponding with the initial date on the HAP contract.  Id. at 30 (citing Ex. K (Deposition

Transcript of DCHA Employee Ronald McCoy) at 58-59).  Thus, the plaintiffs contend that the

defendants refusal to complete the necessary paperwork required by the program amounts to a

refusal to accept the vouchers in violation of both the MAHRAA and the NHA.

### 3.  Legal Analysis

As an initial matter, the Court notes that during the pendency of this litigation, some of the

issues have been narrowed or resolved, most importantly by the plaintiffs' concession that BSA

has a right to discontinue the use of the properties as rental housing and BSA's acknowledgment

that this must be accomplished under local law.  Def.'s Opp'n at 2-3;  Plaintiffs' Reply to

Defendant's Opposition to Plaintiffs' Motion for Summary Judgment ("Pls.' Reply") at 3.

Accordingly, the validity of the defendant's Notice to Vacate for Discontinuance of Use ("Notice

to Vacate") is a question of local law.[7]  In addition, BSA has retreated from its original position

---

[7]The 180-day Notice[s] to Vacate served on the plaintiffs on January 6, 2005, were scheduled to become effective on or about July 6, 2005. Pls.' Mem. at 14 (citing Ex. 3 to Def.'s Mem.)  In its summary judgment motion, BSA relied upon these Notice[s] to Vacate as justification for terminating its landlord and tenant relationships with the plaintiffs. Def.'s Mem. at 4.  According to the plaintiffs, however, "unless and until the D.C. Superior Court finds those notices enforceable and enters judgment for BSA, the property will remain 'rental housing.'"  Pls.' Reply at 1.  And, the plaintiffs have challenged the 180-day notices in the Landlord-Tenant Branch of the Superior Court of the District of Columbia. Id. at 2.  The plaintiffs therefore maintain that while that dispute is ongoing, the plaintiffs

(continued...)

that another basis for ending the rental relationship and granting summary judgment in its favor is that it has a contract for the purchase of the property by a third party.  See Def.'s Mem. at 3-4 ("BSA has contracted to sell the Bates Street Townhomes to a third-party" and "BSA provided [the] [p]laintiffs and all the other residents at the Bates Street Townhomes with the one-year notice required to terminate its participation in the Section 8 HAP contract.") (footnotes omitted). In its opposition to the plaintiffs' partial summary judgment motion, BSA now asserts that the "[p]laintiffs arguments regarding the validity of BSA's notices of discontinuance are based on the assumption that BSA will sell the units to TMS."  Def.'s Opp'n at 4.  BSA accuses the plaintiffs of speculating about what BSA will do in the future, stating that "[a]lthough TMS has expressed a desire to purchase the units, it presently does not have a contractual right to purchase them."  Id. at 4-5 & n 3.  This is directly contrary to BSA's original position.  See Def.'s Mem. at 3 n. 9 (indicating that "[a]ll the vacant units are being sold pursuant to a contract between BSA and TMS Investments, LLC.  A copy of that contract is attached hereto as Exhibit 1.  TMS will purchase the other units, including the non-purchasing [p]laintiffs, as they become vacant."). Accordingly, there is no basis for BSA being awarded judgment on the ground that its landlord tenant relationship with the plaintiff has been severed because BSA has a contract to sell the subject property to a third party.

With respect to counts I and II of the second amended complaint, the question for this Court to resolve is whether the defendant was required under the MAHRAA and the NHA to accept the plaintiffs' enhanced vouchers.  There is no dispute that the answer to this question depends upon

---

[7](...continued)

are entitled to continue renting their homes with the use of their enhanced vouchers.  Id.

15

whether the plaintiffs' homes were being offered as rental property when the vouchers were

tendered.  The Court concludes that they were.  To rule otherwise would undermine the NHA and

the reason the MAHRAA was enacted.

As previously discussed, the purpose for the adoption of the MAHRAA was to protect tenants

impacted by the termination of expiring project-based Section 8 contracts and to prevent their

displacement.  42 U.S.C. § 1437f(t)(2).  In accordance with this objective, the MAHRAA

provides that "the assisted family may elect to remain in the same project in which the family was

residing on the date of the eligibility event for the project."  42 U.S.C. § 1437f(t)(1)(B).  An

"eligibility event" is defined as, inter alia, "the termination or expiration of the contract for rental

assistance . . . for such housing project."  Id. at § (t)(2).  Thus, the MAHRAA afforded the

plaintiffs the option to remain in their homes, as they did here, when the project-based Section 8

program expired at the Bates Street Townhomes.  Moreover, the NHA, in conjunction with the

MAHRAA, provides that "the Secretary shall assure that . . . project owners not interfere with the

efforts of tenants to obtain rent subsidies or other public assistance . . . ."  12 U.S.C. § 1715z-

1b(b)(2).[8]  With respect to the MAHRAA, the plaintiffs allege that "[b]y refusing to accept [their]

enhanced vouchers, [BSA] has violated [the p]laintiffs' rights under the [MAHRAA].  Compl. at

21.  With respect to the NHA, the plaintiffs allege that "by refusing to accept [their] vouchers or

take the steps necessary to enable [the p]laintiffs to use their vouchers at the Bates Street

Townhomes, [the d]efendant has interfered with [the p]laintiffs' efforts to obtain rent subsidies at

---

[8]"The purpose of this section [of the NHA] is to recognize the importance and benefits of cooperation and participation of tenants in creating a suitable living environment in multifamily housing projects and in contributing to the successful operation of such projects, including their good physical condition, proper maintenance, security, energy efficiency, and control of operating costs."  12 U.S.C. § 1715z-1b.(a).

the Bates Street Townhomes in violation of the [NHA], 12 U.S.C. § 1715z-1b(b)(2)."  Compl. at

22.  Moreover, as previously discussed, HUD issued two publications addressing tenants' rights to

remain in their residences in opt-out situations, specifically providing that "[t]enants who receive

an enhanced voucher have the right to remain in their units as long as the units are offered for

rental housing when issued an enhanced voucher sufficient to pay the rent charged for the unit

provided that the rent is reasonable."  Pls.' Mem., Ex. M (HUD Policy Guide) Ch. 11 at 3.  The

HUD Policy Guide also requires owners who elect to opt-out of the project-based Section 8

program to certify that they "will comply with the requirement to allow families receiving

enhanced vouchers who elect to remain do so as long as the property remains rental property,

unless the owner has just cause for eviction."  Id. Ch. 1 at 9.  The HUD Policy Guide and another

HUD publication both provide that "[i]f an owner refuses to honor the tenants right to remain, the

tenant's remedy will depend on State and local law.  Id. Ch. 11 at 3.

Accepting the defendant's position that the subject property is not being offered as rental

property would defeat the objectives of the MAHRAA, the NHA, and the instruction of the HUD

Policy Guide, and would unconditionally deprive the plaintiffs of their right to remain in their

homes.  Indeed, the law is clear that the plaintiffs' right to remain is contingent upon the property

being offered for rental.  Here, that is the case.  The plaintiffs are presently living in the units and

the landlord has been charging and collecting rent from the plaintiffs since BSA opted out of the

Section 8 program.  Moreover, BSA certified to the District of Columbia government that the

plaintiffs units are rental property.  Pls.' Mem. at 21 (citing Ex. E (Department of Consumer and

Regulatory Affairs Housing Regulation Administration Registrations for Bates Street

Townhomes).  The law is also clear that if BSA interferes with the tenant's right to remain, it

must do so in accordance with state and local law.  In that regard, D.C. Code § 42-3505.01 provides that "[n]o tenant shall be evicted from a rental unit for any reason other than for nonpayment of rent unless the tenant has been served with a written notice to vacate which meets the requirements of this section."  As discussed earlier, BSA has already provided the plaintiffs with the required notices to vacate pursuant to District of Columbia law, the requirement having been accomplished on or about January 5, 2004.  These notices matured on or about July 6, 2005, which is the first time that the plaintiffs' units could have qualified as non-rental property. However, the validity of the notices to vacate is being challenged in the local trial court.  Thus, the plaintiffs' right to remain in their homes is secure until a ruling on the adequacy of notices have been made, and this is an issue for the local court, not for this Court to decide.  To be sure, "[a] tenant has a right not to have his or her possession interfered with except by lawful process . . . ." Young v. District of Columbia, 752 A.2d 138, 142 (D.C. 2000) (citing Mendez v. Johnson, 389 A.2d 781, 787 (D.C. 1978)).  Accordingly "'[i]t is well settled in this jurisdiction that a landlord may not use self-help to evict a tenant and that 'the legislatively created remedies for reacquiring possession [of real property] are exclusive.'"  Id.

This Court is compelled to conclude that BSA violated the MAHRAA and the NHA when it refused to accept the plaintiffs' vouchers or take the steps necessary to complete the required paperwork to enable the plaintiffs to use their vouchers and renew their leases, which amounted to interference with the plaintiffs' efforts to obtain rent subsidies at the Bates Street Townhomes. See Jeanty v. Shore Terrace Realty Ass'n, No. 03 Civ. 8669, 2004 WL 1794496 at *3 (S.D.N.Y. Aug. 10, 2004).  In Jeanty, the plaintiff's long-time landlord exercised its right to opt-out of the Section 8 project-based program.  Id.  Thereafter, the landlord refused to complete the paperwork

18

necessary for the plaintiff to receive enhanced vouchers to continue to rent her housing unit.  Id. at

*1-2.  The landlord made this decision because it alleged that the plaintiff and three other tenants,

from whom it also refused to accept enhanced vouchers, were "late-payers or otherwise not ideal

tenants."  Id. at *1.  The plaintiff sued the landlord to enjoin it from refusing to accept her

enhanced vouchers.  Id. at *2.  The Jeanty Court ruled that the landlord was obligated, pursuant to

the NHA, to accept the enhanced vouchers of all tenants who were residing at its property at the

time of the landlord's opt-out decision.  Id. And the Jeanty Court concluded that this obligation

applied even to tenants who chronically paid their rent late, had damaged their apartments, or had

failed to provide access to their apartments for repairs.  Id.  The landlord had therefore mistakenly

believed that it could permissibly refuse to accept vouchers from these tenants without having to

proceed through the normal eviction process.  Id.  The Court therefore ultimately granted the

plaintiff's request for a permanent injunction, reasoning that:

> Giving the words used in 42 U.S.C. § 1437f(t)(1) and (2) their ordinary meaning, it
> is clear that the statute provides families renting at the time of the termination of
> the project-based subsidy contract the right to remain in their units, using enhanced
> vouchers, for so long as the tenant remains eligible for the vouchers or until the
> tenant is evicted.

Id. at *2-*3.  The Court noted that the language which provides a tenant with the right to remain

appears within the enhanced voucher subsection of the statute, stating that "[i]t makes little sense,

therefore, to interpret the statute to mean that landlords must allow a tenant to remain exclusive of

any obligation to accept the tenant's enhanced voucher."  Id.

   Here, in response to the plaintiffs' request for a TRO, this Court ordered BSA to complete the

required paperwork necessary for the plaintiffs to exercise their right to remain in their rental

units.  As in Jeanty, id. at *2, BSA has allowed the plaintiffs to remain in their homes, but has

refused to renew the plaintiff's lease and complete the voucher process by executing a HAP

contract and Lease Addendum, rather insisting that the plaintiffs personally pay their entire rent.

The Court acknowledges that <u>Jeanty</u> is distinguishable from the present case because in <u>Jeanty</u> the

landlord made other housing units available for rent and was fully participating in the Section 8

tenant-based program, but simply declined to rent to the plaintiff.  Notwithstanding this

distinction, it is clear that "families renting at the time of the termination of [a] project-based

subsidy contract [have] the right to remain in their units, using enhanced vouchers, for so long as

the tenant remains eligible for the vouchers or until the tenant is evicted."  <u>Id.</u> at *3.  Thus,

because BSA refused to accept the plaintiffs' enhanced vouchers and refused to complete the

paperwork necessary for the plaintiffs to maintain the vouchers, BSA violated the MAHRAA and

the NHA.  Accordingly, the plaintiffs are entitled to summary judgment on counts I and II of their

second amended complaint.

## B.  The District of Columbia Human Rights Act Claim - (Count III)

Both parties move for summary judgment on count III of the second amended complaint – the

plaintiffs' DCHRA claim.  In this count, the plaintiffs allege that "[b]y refusing to accept vouchers

or take the steps necessary to enable [the p]laintiffs to use their vouchers at the Bates Street

Townhomes, [the d]efendant is discriminating against [the p]laintiffs in violation of the DC

Human Rights Act, D.C. Code § 2-1402.21."  Compl. at 22.  They also contend that the

defendant's policy or practice of refusing to rent to the plaintiffs and other residents based on their

voucher status constitutes discrimination based on the actual or perceived source of the plaintiffs'

income.  <u>Id.</u>  The defendant responds that it "is not discriminating based on source of income,

including whether a person is a voucher recipient; it is simply withdrawing the units from the

market for all renters." Def.'s Mem. at 10.  BSA further represents that it will not extend the

plaintiffs' current leases for a minimum of at least one year because doing so would defeat the 180

day Notice[s] to Vacate provided to the plaintiffs.  Id.

> The DCHRA states in pertinent part:

>> (a) General. -- It shall be an unlawful discriminatory practice to do any of the
>> following acts, wholly or partially for a discriminatory reason based on the actual
>> or perceived: race, color, religion, national origin, sex, age, marital status, personal
>> appearance, sexual orientation, gender identity or expression, familial status,
>> family responsibilities, disability, matriculation, political affiliation, source of
>> income, or place of residence or business of any individual:

>> (1) To interrupt or terminate, or refuse or fail to initiate or conduct any transaction
>> in real property; or to require different terms for such transaction; or to represent
>> falsely that an interest in real property is not available for transaction;

>> (2) To include in the terms or conditions of a transaction in real property, any
>> clause, condition or restriction; . . . .

>> (e) The monetary assistance provided to an owner of a housing accommodation
>> under section 8 of the United States Housing Act of 1937, approved August 22,
>> 1974 (88 Stat. 662; 42 U.S.C. § 1437f, either directly or through a tenant, shall be
>> considered a source of income under this section.

D.C. Code § 2-1402.21(a) & (e).  The plaintiff contends that "the Human Rights Act prohibits a

landlord from taking action against a tenant based on his or her status as a voucher holder, or from

treating voucher funds differently from any other source of income to the tenant."  Pls.' Mem. at

34.  They contend that proof of Section 8 discrimination does not require a showing of anti-

voucher animus on the part of a landlord.  Id.  Instead, the plaintiffs opine that they must only

demonstrate that their "voucher status – i.e., [their] membership in the protected class – was a

'motivating factor' in the landlord's actions."  Id. (citing Hollins v. Fed. Nat'l Mortgage Ass'n,

760 A.2d 563, 575 (D.C. 2000)[9]  The plaintiffs conclude that the landlord's refusal to enter into voucher contracts, but instead demanding the payment of full rent from the tenants personally violates the above District of Columbia Code provisions.  The plaintiffs specifically reference D.C. Code § 2-1402.21(a)(1) & (2), stating that BSA's refusal to accept their vouchers and advising the plaintiffs that if they wanted to remain in their homes they would have to pay the full rent personally is a "'condition or restriction' in the 'terms or conditions of a transaction in real property' based on a tenant's source of income."  Pls.' Mem. at 25.

    After an exhaustive search, this Court did not find, and the parties have not cited, any District of Columbia cases involving claims of discrimination under the DCHRA based on source of income.[10]  Therefore, the Court has looked to other jurisdictions for guidance on the issue.  In Comm'n on Human Rights & Opportunities, ex rel. Colon v. Sullivan, No. CVBR1006541, 2005

---

[9]"DCHRA claims are 'analyzed in the same manner as claims arising under Title VII . . . [u]nder the framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, (1973).'" Bowie v. Gonzales, 433 F. Supp. 2d 24, 34, (D.D.C. 2006) (alteration in original) (quoting Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1553 (D.C. Cir. 1997)).  The McDonnell Douglas test "is to be applied in cases where circumstantial evidence is the only proof of discrimination."  Hollins v. Federal Nat. Mortg. Ass'n, 760 A.2d 563, 574-75 (D.C. 2000) (citing EEOC v. Alton Packaging Corp. 901 F.2d 920, 923 (11th Cir. 1990); see also Cones v. Shalala, 199 F.3d 512, 516 (D.C. Cir. 2000) ("Where, as here, the record contains no direct evidence of discrimination, we employ the familiar burden shifting framework of [McDonnell Douglas]); Clipper v. Billington, 414 F. Supp. 2d 16, 21 (D.D.C. 2006).  However, when proving a case of discrimination by direct evidence, as the plaintiffs allege they can do here, Pls.' Mem. at 35, application of McDonnell Douglas is inappropriate.  Rather, cases involving direct evidence of discrimination are analyzed under the "mixed motives" analysis articulated by the Supreme Court in Price Waterhouse v. Hopkins, 490 U.S. 228, 258 (1989).  Application of the mixed motive analysis requires the plaintiff to show that discrimination "was a motivating factor for any [decisionmaker's] practice, even though other factors also motivated the practice."  Hollins, 760 A.2d at 575.  "In other words, the plaintiff[s] must present evidence of conduct or statements by persons involved in the decision making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the . . . decision . . . ."  Id. (citations omitted).

[10]This Court's research revealed one case in the District of Columbia addressing discrimination based on source of income, Borger Mgt., Inc. v. Sindram, 886 A.2d 52, 58 (D.C. 2005), which included a claim under the DCHRA for discrimination based on source of income.  There, the trial court concluded that the plaintiff failed to present sufficient undisputed evidence to establish as a matter of law that the defendant discriminated against the plaintiff on the basis of source of income.  Id.  However the District of Columbia Court of Appeals reversed this ruling and remanded the case for further proceedings on the source of income issue.  Id. at 64.  Therefore, Borger did not provide any meaningful analysis with respect to source of income discrimination claims.

WL 2855540, at *1, *3 (Conn. Oct. 7, 2005), a state agency, on behalf of a prospective tenant,

alleged that the prospective tenant had been discriminated against by the defendants in violation

of Sec. 46a-64c of the Connecticut General Statutes, because one of the legal sources of income

she would use to pay her rent was Section 8 funds.  This section of the Connecticut General

Statutes provides, in pertinent part:

> Discriminatory housing practices prohibited . . . (a) It shall be a discriminatory
> practice in violation of this section: (1) To refuse to . . . rent after the making of a
> bona fide offer, or to refuse to negotiate for the . . . rental of, or otherwise make
> unavailable or deny, a dwelling to any person because of . . . lawful source of
> income . . . .

Id. at *1 n.1.  The defendant landlord denied the state agency's discrimination claim and alleged

that he had three legitimate reasons for refusing to rent his residential unit to the prospective

tenant; namely, that she was rejected because she had bad credit, a bad attitude and insufficient

income.[11]  However, the court found that the evidence supported the agency's position that the

prospective tenant had been discriminated against in violation of Connecticut law and concluded

that the defendant had "failed to carry their burden in establishing each of their special defenses."

Id. at *3.

The parties in Sullivan agreed that the case was best analyzed under the "mixed motive"

doctrine, which the Connecticut Supreme Court had held governed whether a violation of Section

46a-64c had been committed.  Under this doctrine, in the context of the factual situation in

---

[11]Section 46a-64c(b)(5) of the Connecticut General Statutes provides in pertinent part: "The provisions of this section [(46a-64c)] with respect to the prohibition of discrimination on the basis of lawful source of income shall not prohibit the denial of full and equal accommodation solely on the basis of insufficient income."  Sullivan, 2005 WL 2855540, at *1 n. 5.

Sullivan, if a rental decision is motivated by both legitimate and illegitimate reasons, one of two methods may be used to determine if discriminatory action had been committed. Id.; see, e.g., Levy v. Comm'n on Human Rights and Opportunities, 671 A.2d 349, 356 (Conn. 1996); Avalon Bay Communities v. Orange, 775 A.2d 284, 308 (Conn. 2001). "Under the Price Waterhouse mixed motive model" analysis, a plaintiff must establish his or her prima facie case of discrimination by showing that a potential landlord's decision not to enter into a rental agreement was motivated by one or more prohibited events, by either direct or circumstantial proof that an adverse rental decision was based on a desire not to rent to Section 8 recipients. Levy, 671 A.2d at 356; accord, Porter v. Natsios, 414 F.3d 13, 18 (D.C. Cir. 2005) (citing Price Waterhouse, 490 U.S. at 228) ("Under [the mixed motive] framework, an employee could establish a prima facie case of an unlawful employment practice by demonstrating that discrimination or retaliation played a 'motivating part' or was a 'substantial factor' in the employment decision."); Johnson v. Holway, 439 F. Supp. 2d 180, 223 (D.D.C. 2006) ("Under the 'mixed motive' framework of [Price Waterhouse], a union member may proceed instead by demonstrating that 'retaliation played a 'motivating part' or was a 'substantial factor' in the [union's] decision.'"). And this can be demonstrated through proof of a plaintiff's disparate treatment, i.e., proof of different treatment resulting from being part of a protected class or status. Levy, 671 A.2d at 356. "There are two essential elements required in [a] plaintiff['s] proof in a Price Waterhouse mixed motive analysis." Sullivan, 2005 WL 2855540, at *4. First, the plaintiff must prove that "she was a member of a protected class" and second, she must prove that "an impermissible factor played a motivating or substantial role in the renting decision." Id. (citing Price Waterhouse, 490 U.S. at 258; Levy, 671 A.2d at 357). "[T]he illegal motivating factor need not be the only factor, but

must be a <u>substantial</u> factor in bringing about the prohibited consequence." <u>Id.</u> (citing <u>Price Waterhouse</u> 490 U.S. at 241, 259); <u>Porter</u>, 414 F.3d at 18; <u>Johnson</u>, 439 F. Supp. 2d at 223). After a plaintiff has established a <u>prima facie</u> case of discrimination, the burden shifts to the defendant to prove by a preponderance of the evidence that it would have made the same decision even if it had not taken the illegal factor into consideration. <u>Id.</u> (citing <u>Price Waterhouse</u> 490 U.S. at 258); <u>Porter</u>, 414 F.3d at 18. If this burden is satisfied by the defendant, "then the trier must determine from all of the evidence if the plaintiff has met her burden of proving disparate treatment by a fair preponderance of the evidence." <u>Sullivan</u>, 2005 WL 2855540, at *4 (emphasis omitted) (citing <u>Price Waterhouse</u> 490 U.S. at 260; <u>Miko v. Comm'n on Human Rights and Opportunities</u>, 596 A.2d 396, 402 (Conn. 1991)).

Applying this standard to the operative facts, the <u>Sullivan</u> Court concluded that it was undisputed that the plaintiff was a member of a protected class due to the fact that she received funds from HUD's Section 8 program to pay here rent. <u>Id.</u> Thus, the principal issue the court had to address was whether an "impermissible factor played a substantial role in the landlord's decision not to rent to Colon and, if so, whether one or more of the defendant's special defenses would overcome the plaintiff's claims of discrimination." <u>Id.</u> In this regard, the <u>Sullivan</u> Court noted that the defendant's "aversion to participating in the Section 8 program" and knowledge that the plaintiff was a Section 8 recipient, which the landlord categorically concluded disqualified her from becoming a tenant, were both impermissible motivating factors that played a role in the rental decision. <u>Id.</u> at *4-5. Moreover, the <u>Sullivan</u> Court found the defendant's desire not to "change the terms of [their] lease to conform to Section 8 requirements" was also "an improper motive," and concluded that this "motive was not only substantial, [but] it overrode all other

25

considerations that went into [the defendants'] decision making process in this instance." Id. at

*5.  In other words, the Sullivan Court held that "because of [the defendant's] dislike for the

Section 8 program, it was [their] policy to disqualify all applicants who derived any portion of the

rental from a Section 8-HUD subsidy."  Id.  Thus, the Sullivan Court concluded that it was the

landlord's intention from the "very beginning to treat all persons of the protected class –

specifically, persons receiving Section 8-HUD supplemental rental income – differently from all

other persons."  Id. at *6.  This, the court found, was the "essence of impermissible disparate

action."  Id.[12]  Sullivan, although similar in many respects, is also distinguishable from the present

case in several respects, the most important distinction being that the landlord in Sullivan had

never rented to Section 8 recipients.  And although this fact is not determinative, it is not

insignificant to this Court's analysis.

     Here, as in Sullivan, it is undisputed that the plaintiffs have membership in a protected

class as Section 8 voucher recipients.  However, the plaintiffs' burden of proving that an

impermissible factor played a motivating or substantial role in BSA's decision not to accept their

enhanced vouchers so they can remain at the Bates Street Townhomes is more difficult to assess.

In this regard, the plaintiff must offer direct or circumstantial evidence that the adverse

consequences related to their efforts to remain in their homes is based on an impermissible factor,

here, that the refusal to accept the plaintiffs' enhanced vouchers was premised on the fact that

their source of income were Section 8 vouchers.  The plaintiffs contend that pursuant to the

DCHRA, the landlord is prohibited "from taking action against [them as] tenant[s] based on

---

[12]The court also concluded that the defendants failed to carry their burden of establishing each of their
special defenses, that the plaintiff was ineligible for rental due to bad credit, had a bad attitude and lacked sufficient
income. Sullivan, 2005 WL 2855540 at *6-7.

[their] status as . . . voucher holder[s], or from treating voucher funds differently from any other source of income" tenants use to pay for housing. Pls.' Mem. at 34. However, unlike the landlord in <u>Sullivan</u>, where the Court was confronted with direct evidence that the landlord had an "an aversion to participating in the Section 8 program," <u>Sullivan</u>, 2005 WL 2855540 at *4, here, the plaintiffs' status as voucher holders was not a motivating factor in BSA's refusal to accept the enhanced vouchers. Rather, BSA desires to withdraw the Bates Street Townhomes from the rental market and sell the property to a third party who plans to convert the property into residential housing for home owners. And the defendant feared that accepting the vouchers "for at least another year [would] defeat [] [its] notices for discontinuance of housing use[]." <u>See</u> Def's Opp'n at 12. Moreover, BSA has made it perfectly clear that it no longer offers any of the units in the Bates Street Townhomes as rental housing. <u>Id.</u> at 3. Thus, the plaintiffs have not established a <u>prima facie</u> case of discrimination under the DCHRA because they have not shown that an impermissible factor played a motivating or substantial role in the action it has or has not taken; namely, that BSA refused to accept the plaintiffs' enhanced vouchers because their source of income was the tenant-based Section 8 program. Accordingly, summary judgment on count III of the second amended complaint is granted in favor of BSA.

**C.      The District of Columbia Consumer Protection Procedures Act Claim - (Count IV)**

The plaintiffs allege that the "[d]efendant has engaged in 'unlawful trade practices' by misrepresenting [the p]laintiffs' right to remain in their homes [with the use of their Section 8 vouchers, in a manner that had a tendency to and did mislead the [p]laintiffs regarding their rights; by leasing the [p]laintiffs' units in a manner that is not consistent with the requirements of federal law; and by attempting unconscionably to enforce the terms of the [p]laintiffs' rental agreement

by asking the [p]laintiffs to pay the full contract rent on [their] unit[s] as a condition to remaining

after the expiration of the project-based Section 8 contract." Id. Compl. ¶ 96. The plaintiffs

argue that "BSA's conduct, including taking advantage of its power over the plaintiffs and

misleading them regarding their right to remain, violates the [District of Columbia Consumer

Protection Procedures Act]" ("CCPA") Pls.' Mem. at 38.

BSA moves for summary judgment on this claim arguing that "landlord-tenant relations

are specifically excluded from the statute's coverage". Def.'s Mem. at 12 (citing D.C. Code § 28-

3902(c)(2)(A) in footnote 25).[13]  D.C. Code § 28-3903 states, in pertinent part:

> (a) The Department [of Consumer and Regulatory Affairs], in its discretion, may:
>  (1) receive and investigate any consumer complaint and initiate its own
> investigation of deceptive, unfair, or unlawful trade practices against consumers
>     . . . .
> (c) The Department may not:
>     . . . .
>  (2) apply the provisions of section 28-3905 to:
>     (A) landlord-tenant relations;

D.C. Code § 28-3903(a)(1) & (c)(2)(A) (emphasis added). The plaintiffs challenge BSA's

interpretation of the CCPA, claiming that the "Act's exclusion of landlord tenant relations applies

only to [District of Columbia] government administrative actions, not to private enforcement

suits." Pls.' Mem. at 40. They contend that "[a]mong other flaws, BSA's argument fails to

distinguish between administrative and judicial enforcement of the []CPPA." Id. at 41. While the

---

[13]The defendant has incorrectly cited D.C. Code § 28-3902(c)(2)(A). D.C. Code § 28-3902(c) provides for the appointment of a Chief of the Office of Compliance to carry out investigative, conciliatory, and other duties assigned by the Director of the Department of Consumer and Regulatory Affairs. However, D.C. Code § 28-3903, which the Court believes the defendant intended to cite, addresses the exclusion of landlord-tenant relation matters from the reach of the CCPA.

plaintiffs acknowledge that "[a]lthough the law bars the Department of Consumer and Regulatory

Affairs ("DCRA") from exercising jurisdiction over landlord [and] tenant [matters, they argue

that] it includes no such restriction on a consumer's ability to enforce the Act in court."  Id. at 41.

The plaintiffs' reasoning is premised on their supposition that "[a] consumer is not required . . . to

pursue [the] administrative remedies [provided by the CPPA] to recover for unlawful trade

practices."  Id. (citing D.C. Code §28-3905(k)(1)).  And they opine that the CCPA has a two-

pronged enforcement scheme which allows "an aggrieved consumer to either make a[n

administrative] complaint to the . . . DCRA or sue [independently] to enforce rights in D.C.

Superior Court."[14]  Id. (emphasis added).

> D.C. Code §28-3905(k)(1)) provides that
>
> A person, whether acting for the interests of itself, its members, or the general
> public, may bring an action under this chapter in the Superior Court of the District
> of Columbia seeking relief from the use by any person of a trade practice in
> violation of a law of the District of Columbia and may recover or obtain the
> following remedies . . . .

According to the plaintiffs, this section of the CCPA authorizes them to sue for unfair trade

practices in the landlord-tenant context only in a court of law, as opposed to seeking relief through

the administrative process.  Pls.' Mem. at 40.  Prior to the 2000 amendments to the Act, the

private right of action section of the CPPA provided that:

> Any consumer who suffers any damages as a result of the use or employment by
> any person of a trade practice in violation of a law of the District of Columbia
> within the jurisdiction of the Department may bring an action in the Superior Court
> of the District of Columbia to recover or obtain any of the following . . . . ·

---

[14]D.C. Code § 28-3902 (2001) provides that "[t]he Department of Consumer and Regulatory Affairs shall be the principal consumer protection agency of the District of Columbia government and shall carry out the purposes of this chapter."

D.C. Code § 28- 3905(k)(1) (1991).  The 2000 amendments eliminated the "within the

jurisdiction of the Department" language, thereby expanding the protection provided to

consumers.  Accord, Williams v. Purdue Pharma Co., 297 F. Supp. 2d 171, 173 (D.D.C. 2003)

("'[T]he CPPA evidently was intended to be a far-reaching consumer protection law.' Howard v.

Riggs Nat'l Bank, 432 A.2d 701, 710 (D.C. 1981).  It was amended effective October 19, 2000, to

expand its reach even further.")  Thus, the plaintiffs contend that the 2000 amendments to the

CPPA "support the distinction [it draws] between [the] DCRA's jurisdiction and the powers of

the court," Pl.'s Mem. at 43, and further argues that "the legislative history [of the DCRA] as a

whole makes clear [that] . . . the landlord-tenant exclusion relate[s] to the powers of the DCRA,

not a consumer's ability to sue privately in court." Id. at 42.  However, the Court cannot embrace

the interpretation the plaintiffs would have it give to the CCPA.  This result is evident from the

District of Columbia Court of Appeals' refusal to affirmatively rule that the 2000 amendments to

the CPPA affords a private right of action to tenants or prospective tenants embroiled in landlord-

tenant disputes.

For example, in Childs v. Purll, 882 A.2d 227, 237 (D.C. 2005), the District of Columbia

Court of Appeals ruled that the "appellants' misrepresentation claims [could not] be pursued

under the [CPPA] because those claims [arose] . . . in the context of landlord-tenant relations."

Id.  In that case, the tenants sued the landlord and its management company for, inter alia,

violation of the CPPA resulting from an alleged misrepresentation that their apartment complied

with the District of Columbia Housing Regulations, even though it contained lead based paint that

was accessible to children. Id. at 231.  The trial court ruled that the appellants' CPPA claims were

"precluded because the Act [was] not applicable to landlord-tenant relations . . . ." Id. at 231. The Court of Appeals affirmed the trial court's ruling, concluding that "the trial court was correct in ruling as a matter of law that appellants' misrepresentation claims cannot be pursued under the [CPPA] because those claims . . . arise in the context of landlord-tenant relations." Id. at 237. The Court reasoned that "where the Act limits the jurisdiction of the [DCRA] 'the scope of the cause of action created by § 28-3905(k)(1) is similarly limited.'" Id. at 238 (quoting Diamond v. Davis, 680 A.2d 364, 365 n.2 (D.C. 1996). The Court noted that the Act "limits the jurisdiction of the [DCRA] in a number of substantive ways; of pertinence to the present case, the Act specifically states that the Department may not . . . apply the [complaint adjudication] provision of section 38-3905 to . . . landlord-tenant relations. . . ." Id. (citing D.C. Code § 3903(c)). The Court of Appeals concluded that "[i]t follows from Diamond that former § 28-3905(k)(1) is subject to the same substantive limitations, i.e., it does not authorize a private action in Superior Court where the claim . . . arose in the context of landlord-tenant relations." Id. at 238. The Court also noted, however, that section 28-3905(k)(1) was amended in October 2000 "so that the subsection no longer explicitly links the scope of private civil actions to the jurisdiction of the [DCRA]," and then specifically declined to decide whether the Council of the District of Columbia intended thereby to expand the private right of action. Id.; see also Twin Towers Plaza Tenants Ass'n, Inc. v. Capitol Park Assocs., L.P., 894 A.2d 1113, 1120 (D.C. 2006) ("In Childs v. Purll, 882 A.2d 227 (D.C. 2005) we recognized that § 28-3905(k)(1) 'no longer explicitly links the scope of private civil actions to the jurisdiction of the [DCRA].' Id. at 238. However, we did not need to decide 'whether the Council intended . . . to expand the private right of action' to cover landlord-tenant relations.")

While the District of Columbia Court of Appeals has stated that "the CPPA evidently was intended to be a far-reaching consumer protection law," Howard, 432 A.2d at 710, and a member of this Court noted that the CPPA was amended in 2000 to expand its reach even further, Williams v. Purdue Pharma Co., 297 F. Supp. 2d 171, 173 (D.D.C. 2003), the highest Court of the District of Columbia specifically declined to address whether any expansion brought about by the 2000 amendments was "intended . . . to expand the private right of action" to landlord-tenant relations. Childs, 882 A.2d at 238. Accordingly, absent such an express expansion by the District of Columbia Court of Appeals, the Court must look to the words of the current version of the statute itself, which is where any analysis of the scope of a statute's reach must begin in any event. "Unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." BP Am. Prod. Co. v. Burton, 127 S. Ct. 638, 643, ___ U.S. ___, ___ (2006); see also Crescent Properties v. Inabinet, 897 A.2d 782, 786 (D.C. 2006) ("[I]n examining the statutory language, it is axiomatic that the words of the statute should be construed according to their ordinary sense and with the meaning commonly attributed to them.") (citations omitted). The plain language of the current version of the CPPA clearly provides that "[t]he department may not . . . apply the provisions of section 28-3905 . . . to landlord tenant relations." This language leads the Court to the conclusion that it cannot adhere to the plaintiffs' interpretation of the statute. Moreover, the Court notes that the District of Columbia has a wealth of statutory authority addressing landlord-tenant relations, thus, causing the Court to conclude that allowing the plaintiffs to seek relief through the CPPA, rather than the laws specifically enacted to address such matters, would be an inappropriate back door expansion of the range of remedies expressly made available to tenants in landlord tenant matters. Indeed, the plaintiffs themselves

acknowledge that "[i]n the District of Columbia, landlord-tenant rights are governed principally by two laws: the Rental Housing Act, which addresses termination of tenancy and eviction; and the Rental Housing Conversion Sale Act, which covers a landlords's ability to sell or convert a rental property and the tenant's rights under those circumstances." Pls.' Mem. at 6. And it is these provisions under which the plaintiffs must seek relief. Therefore, BSA is entitled to summary judgment on count IV of the second amended complaint.

## IV.  Conclusion

BSA is legally obligated to accept the plaintiffs' enhanced vouchers. This obligation includes completing the necessary paperwork for the tenants to participate in the enhanced vouchers program. Thus, the tenants currently have the right to remain in their rental units. And for BSA to legally interfere with the tenant's right to remain in their homes, it must do so in accordance with District of Columbia law. This has not been done, and therefore, the plaintiffs are awarded partial summary judgment on Counts I and II of the plaintiffs' second amended complaint and BSA's motion for summary judgment on these counts is denied. However, for the reasons set forth above, BSA is awarded summary judgment on counts III and IV of the second amended complaint and these claims are therefore dismissed with prejudice.[15]

SO ORDERED this 11th day of January, 2007.

REGGIE B. WALTON
United States District Judge

---

[15]An Order consistent with this Memorandum Opinion is being issued contemporaneously herewith.